FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

IN THE UNITED STATES DISTRICT COURT    OCT 0 1 2004

FOR THE DISTRICT OF HAWAII    at __8__ o'clock and __55__ min. A __LS__ M.
WALTER A. Y. H. CHINN, CLERK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. 03-00244 SOM |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER DENYING MOTION TO |
| vs. | ) | DISMISS ON DOUBLE JEOPARDY |
| | ) | GROUNDS |
| BASHO ELLIOT, aka "Bosch | ) | |
| Elliot," | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

ORDER DENYING MOTION TO DISMISS ON DOUBLE JEOPARDY GROUNDS

I.      INTRODUCTION.

Defendant Basho Elliot moves for dismissal of this drug
case on the ground that any trial would place him in double
jeopardy.  Previous trial proceedings ended in a mistrial before
the evidence closed.  During the cross-examination of Sergio
Hevia, a defense witness, the court learned that Hevia had been
represented by Elliot's lead trial counsel, who was then Richard
Gordon, an out-of-state attorney who had been admitted pro hac
vice.  When Hevia invoked his Fifth Amendment right and declined
to answer further questions on cross-examination, the court
struck all of Hevia's testimony.  The Government urged the court
to declare a mistrial, but Elliot argued that the trial should
proceed with the same lead trial counsel.  Elliot declined to
admit, deny, or waive any conflict and announced that he was not
waiving any right, including his right to representation by
conflict-free counsel.  Concluding that Elliot was attempting to

preserve an appellate issue if convicted at trial, the court also expressed concern that Gordon might be more interested in protecting himself against charges of unethical conduct than in advocating on Elliot's behalf.  The court declared a mistrial based on manifest necessity, which Elliot now challenges on grounds never raised previously.

The court denies Elliot's motion to dismiss on the grounds that (1) Elliot waived the arguments he now makes, and (2) even if the court considers the arguments, it was manifestly necessary to declare a mistrial.

II.     BACKGROUND FACTS.

This case stems from the sending of a Federal Express parcel containing about four and a half pounds of cocaine from California to Hawaii.

At trial, Frank Herbert, a special agent supervisor with the California Department of Justice, testified that, on May 1, 2003, he was at the Federal Express hub in Van Nuys, California.  See Testimony of Frank Herbert (April 8, 2004) at 3-42 to 3-44 (transcript citations begin with the volume and are followed by specific page numbers).  Herbert saw a heavily taped, new box with a handwritten airbill.  The box was addressed to Adam Stevens, at 116 Kanunakea Street in the town of Lahaina on the Island of Maui, Hawaii, and the sender had paid $131 to ship it.  Id. at 3-45 to 3-46.  Herbert called the phone number of the

listed shipper, Marcus Santas, only to be told that no one at
that phone number had that name. Id. at 3-48. Herbert,
suspicious that the package contained contraband, contacted the
Drug Enforcement Administration's Honolulu Airport Task Force to
arrange for a controlled delivery of the parcel. Id.

The DEA Airport Task Force in Honolulu accepted the
package, obtained a search warrant to search its contents, and
found what appeared to be two kilograms of cocaine. See
Testimony of Russell Woodward (April 8, 2004) at 3-78, 3-81 to 3-
82, 3-85 to 3-86. The material was sent to the DEA's Southwest
Laboratory in San Diego, which confirmed that the substance from
the parcel was 2,003 grams, or approximately four and a half
pounds, of 87% pure cocaine. See Testimony of Dean Kirby (Apr.
9, 2004) at 4-66.

In the meantime, the agents in Honolulu had rewrapped
the box, replacing the cocaine with a substance that looked like
cocaine. A beeper was installed in the box that allowed the
officers to track it and know when it was opened. The inside of
the box and the package of fake cocaine were dusted with Sirchie
powder. See Testimony of Damien Mediola (April 9, 2004) at 4-76
to 4-79. The Sirchie powder, visible only under ultraviolet
light, was intended to help identify persons who touched the
inside of the box or the package of fake cocaine. Testimony of
Richard Jones (Apr. 9, 2004) at 4-102.

3

A law enforcement officer posing as a Federal Express delivery driver then delivered the box to the address on the parcel, 116 Kapunakea Street. Id. at 4-79. He told a person at that address that he had a parcel for Adam Stevens, the person to whom it was addressed. Id. at 4-81. A woman signed for the box, and the officer left it in the garage area. Id. at 4-83 to 4-84; Woodward Testimony at 3-100.

The chief Government witness was a cooperating codefendant, John Theodore Meston. Meston lives at 116 Kapunakea Street, the address on the box. See Testimony of John Theodore Meston (April 9, 2004) at 4-205. According to Meston, Elliot used to be his neighbor on Kapunakea Street. Meston Testimony at 4-207 to 4-208. Both men earned money by catching and selling fish and sometimes worked together. Id. at 4-205, 4-209. Meston testified at trial that, sometime in 2002, Elliot had asked him to receive a package for him in exchange for money. Id. at 4-210. Meston said that Elliot gave him $1,500 for the first package Meston received for Elliot. Id.

Meston testified that he received $2,000 from Elliot for the second and third packages he received for Elliot. Id. at 4-214 and 4-218. Another package, the one in issue in this case, arrived on May 6, 2003, a day that Meston also claims to have had some fresh fish to deliver to Elliot. Meston said that he put the package in the car and drove it to Elliot's house to deliver

4

along with the fish. Id. at 4-222. Meston said that Elliot never provided details of what was in the packages, instead cautioning Meston that the less Meston knew about the contents of the packages, the better off Meston would be. Id. at 4-210.

Meston testified that, when he got to Elliot's house with the parcel, Elliot said, "Let's go in the back and I'll give you your money." Id. at 4-223. The men then moved from the residence to a structure in the back of the property that Elliot used for shaping surfboards. Meston testified that, in the shaping room, Elliot expressed concern that something was amiss with the tape on the parcel. According to Meston, Elliot then called someone named "Andy" on Elliot's cell phone. Id. at 4-224. Meston said that Elliot then opened the parcel, picked up the cellophane bag inside, and threw it at Meston, saying, "It feels really light." Id. at 4-225.

Meston testified that Elliot made another telephone call, mentioning weight during the call. There was then a knock at the door. Id. 4-226. It was the police, who arrested Meston and Elliot. Id. 4-227. Meston testified that, after he was arrested, Elliot apologized to him several times about what had happened. Id. at 4-230.

DEA Special Agent Richard Jones was part of the team that arrested Meston and Elliot. See Testimony of Richard Jones (Apr. 9, 2004) at 4-92. Jones testified that the surveillance

5

team went to the shaping room after the beeper in the parcel went off. Id. at 4-97. He testified that he could see the opened parcel and its contents in the room through the door that Elliot opened. Id. at 4-98. Elliot and Meston were both tested for the Sirchie powder that agents had put on the contents of the parcel, and ultraviolet light revealed Sirchie powder on Elliot's hands, face, and the front of his shorts, indicating that Elliot had touched the contents of the parcel. Id. at 4-102; Testimony of Honolulu Police Department Detective Tanya Tano (Apr. 9, 2004) at 4-178 to 4-179. Sirchie powder was also detected on Meston's hands. Tano Testimony at 4-178.

At trial, Meston admitted to the jury that he had "pled guilty to doing a favor for Basho Elliot." Id. at 4-206.

On cross-examination, Meston testified that he had quitclaimed his interest in real property to three people. See Meston Testimony at 5-90 to 5-91. Elliot's position was that this quitclaim was in lieu of payment for the drugs lost when the Government seized the parcel that Meston had taken to Elliot's home. Elliot therefore made the point that the quitclaim was evidence that Meston was more involved with the drug scheme than his direct testimony had suggested. Meston denied that this quitclaim deed was related to cocaine. Id. at 5-91 to 5-92. On redirect, Meston explained that he had originally signed a mortgage on the property only so that the inclusion of his income

6

would help his girlfriend and her family to qualify for a loan with which to purchase the property. He testified that, when that family wanted to refinance the loan, the family did not need him on title to qualify for the loan, and he therefore quitclaimed his interest in the property. Id. at 5-123 to 5-124.

DEA Special Agent Jones testified that agents recovered $16,900 from a safe in Elliot's house. Jones Testimony at 4-116. Jones testified that Elliot's 2002 tax return indicated a total income of $11,867 and an adjusted gross income of $13,921 for 2001. He testified that Elliot's wife's 2002 tax return indicated a total income of $5,619. Id. at 4-128.

Detective Tano testified that, while Elliot was waiting to be transported off his property, Elliot told her that "he was so stupid to do this." Tano Testimony at 4-181. According to Tano, Elliot explained that he had been trying to "take the easy way because his father had helped him buy the property and he had a hard time making the mortgage." Id. at 4-182.

DEA Special Agent Gerald Lawson was qualified as an expert in the modus operandi of drug traffickers, specifically with respect to the manner in which parcels are used for delivering drugs, as well as distribution activities and the value of drugs. See Testimony of Gerald Lawson (April 13, 2004) at 5-172. Lawson testified that drug traffickers often send packages containing illegal narcotics to relatives' or other

7

associates' houses using fictitious names.  He said that a drug
trafficker would then go to the house to pick up the parcel.
Lawson testified that drug traffickers use this procedure in an
attempt to distance themselves from parcels of drugs and to evade
detection by law enforcement.  Id. at 5-175.

    Elliot presented an aggressive defense at trial.  In an
attempt to impugn Meston, Elliot called an expert witness, Frank
Panessa, a retired DEA agent, who opined that Meston's quitclaim
appeared to be payment for the seized drugs, that the purity of
the cocaine was too high to be suitable for sale on the street,
that Elliot should have had more cash in his house if he were a
drug dealer, and that the absence of drug paraphernalia and
equipment on Elliot's property suggested that he was not a drug
dealer.  See Testimony of Frank Panessa (April 15, 2004), at 7-16
to 7-25.

    Elliot also called as a witness his father, Michael
Elliot, who testified that he and his friend, Barbara Arens,
provided financial support to Elliot.  For example, Michael
Elliot said that Arens had purchased a diamond engagement ring
from Tiffany's for Elliot to give to his then-girlfriend when he
proposed marriage.  See Testimony of Michael Elliot (April 14,
2004) at 6-83.  Michael Elliot testified that he was the source
of the cash found in Basho Elliot's house, and that the money was
intended for home renovations and repairs and for emergencies.

8

Id. at 6-87.  The defense offered as exhibits selected pages of
bank statements that did not include the name of the account
holder.  Michael Elliot testified that withdrawals shown on those
pages represented cash withdrawals he had made of money he
delivered to his son.  The documents did not appear to the court
to be authentic, and the court declined to admit them, noting out
of the presence of the jury that the documents appeared to have
been doctored.  Id. at 6-127 to 6-140.  In connection with the
present motion, the Government has stated that it believes the
documents are indeed authentic.  See United States of America's
Memorandum in Opposition to Defendant Basho Elliot's Motion to
Dismiss Indictment (Sept. 17, 2004) at 4 n.3.

        Michael Elliot's testimony about providing money to
Basho Elliot was corroborated by Basho Elliot's wife.  See
Testimony of Liane Curtiss (April 14, 2004) at 6-169 to 190.

        Elliot then called two witnesses to undercut Meston's
testimony directly.  Frankie Vargas took the witness stand to
explain the telephone calls that Elliot made the day he was
arrested.  The Government's position had been that the calls were
related to Elliot's drug activity.  Vargas testified that he
lived in California and was using a cell phone that day to which
Elliot, calling from Hawaii, placed several calls.  Vargas
identified himself as the brother of Elliot's former girlfriend
and explained that the phone had been supplied by the owner of

the restaurant at which he worked as a sous chef. Id. at 7-59 to
7-60. Vargas testified that, on the day Elliot was arrested,
Elliot made several telephone calls to him relating to surfing
equipment. Vargas testified that he took one call that day even
while working at the height of the dinner rush. Id. at 7-66 to
7-68. He said cocaine was not mentioned at all during the phone
calls. Id. at 7-68. Vargas testified that the first call on May
6 had to do with the status of a surfboard. Id. at 7-82 to 7-83.
Six minutes later, Vargas said, he had another telephone
conversation with Elliot in which they just talked. Id. 7-83.
Vargas also testified that, several hours after that, they
conversed "about small talk, surfing, the [surfing] planer," and
matters similar to those covered in the  conversations earlier
that day. Id. at 7-84 to 7-85.

        This volume of calls between Vargas and Elliot on May
6, 2003, was higher than normal, as Vargas said they had only
spoken "maybe ten" times from April to December 2003.

        The main defense witness was Sergio Hevia. Hevia, who
lives in California, testified that he had met Meston a few years
earlier while vacationing on Maui. See Testimony of Sergio Hevia
(April 15, 2004) at 7-89. In response to an evidentiary
objection, Gordon, Elliot's attorney, made a proffer out of the
hearing of the jury, explaining that he expected Hevia to testify
that Meston, far from being just a "maildrop" for Elliot, had

10

actually been the one who had called Hevia and asked Hevia to
mail the parcel containing drugs from California to Hawaii.
Id. at 7-95 to 7-96.  Given this proffer, the court became
concerned that Hevia might be implicating himself in the very
crime at issue in this case.

 The court then asked Gordon whether Hevia had an
attorney.  Gordon replied, "Not here, no, Your Honor.  No he
doesn't."  Id. at 7-109.  This statement turned out to be not
entirely forthcoming.

 In a discussion with the court about whether Hevia's
Fifth Amendment rights would be implicated by Hevia's testimony,
Gordon claimed that Hevia had not known and had had no reason to
suspect that the package contained illegal drugs.  Id. at 7-110.
The court nevertheless informed Hevia of his Fifth Amendment
rights and of his right to counsel.  See id. at 7-112 to 7-113.
Hevia waived his rights, saying that he was prepared to answer
questions and did not want to speak to an attorney.  Id. at 7-13
to 7-114.

 On direct examination, Hevia testified that Meston had
called him and asked him to pick up a box from a guy named Randy
and to send it via Federal Express.  Id. at 7-121 to 7-122.
Hevia said that he agreed to do that, knowing nothing about what
was in the box and not suspecting that anything was amiss.
Id. at 7-122.  Hevia said that he picked up the package from

11

Randy and that Randy gave him $100 to mail it.  Id. at 7-123.

Hevia testified that it cost a little more than $100 to mail it;

Hevia said he unquestioningly paid the difference himself.

Id. at 7-124.  According to Hevia, he called Meston a few weeks

after he mailed the package.  Hevia testified that Meston sounded

strange over the phone and told Hevia that something had

happened, that Hevia should not call him anymore, and that Meston

would call Hevia instead.  Id. at 7-125.

On cross-examination, Hevia reiterated that he had met

Meston while vacationing on Maui.  However, when questioned about

the details of the vacation, Hevia said he did not remember the

name of the hotel he had stayed at, the last names of the people

with whom he had traveled to Hawaii, or even the city on Maui

that he was visiting.  Id. at 7-130 to 7-133, 7-136.  Hevia

testified that, after he got the package from Randy, he took it

to a place similar to Mailbox, Etc., to mail.  See id. at 7-175.

Asked whether he ever learned what was in the package.  Hevia

responded that he eventually found out through Gordon.  Id. at 7-

180.  Hevia explained that, a few months after his strange phone

call with Meston, he contacted Gordon out of concern about

Meston's behavior on the phone.  Id. at 7-181 to 7-182, 7-184.

Hevia explained that Gordon had been his attorney in connection

with some traffic violations.  Id. at 7-184 to 7-185.

12

A discussion out of the hearing of both Hevia and the jury followed. The court, which had not previously known that there was any attorney-client relationship between Hevia and Gordon, questioned Gordon about his relationship with Hevia. Id. at 7-191. Gordon answered, "I don't think I can answer any of that, Your Honor. I don't think I'm permitted to. I think I have issues of confidentiality." Id. at 7-192. The court expressed concern that, in earlier waiving his rights, Hevia may have been influenced by the presence of someone he thought he could look to for legal advice. Thus, he may have waived his right to counsel thinking he had counsel present in the form of Gordon. Id. at 7-192 to 7-193. The court asked Gordon whether he had written conflict waivers from both Elliot and Hevia, and Gordon said he did not. Id. at 7-194.

With the jury still absent, the court then brought Hevia back to the witness stand and questioned him about whether Gordon was his attorney. Hevia testified that Gordon had represented him with some traffic matters and that, when he called Gordon about Meston, he was seeking legal advice pertaining to the parcel at issue in this case. Id. at 7-196. Upon hearing this, the court appointed counsel for Hevia. Id. 7-196, 7-208, 7-211 to 7-212. After consulting with his newly appointed counsel, Hevia invoked his Fifth Amendment rights. Id. at 7-216 to 7-217. This invocation prevented the Government

13

from completing its cross-examination of Hevia. Again out of the jury's presence, the court then discussed with counsel the court's proposal to strike all of Hevia's testimony in light of the lack of full cross-examination. Gordon objected, saying that Hevia's testimony was relevant and tended to exonerate Elliot. However, despite repeated questioning by the court, Gordon refused to explain why that meant that Hevia's testimony should be allowed to stand in the absence of an opportunity for the Government to cross-examine. Id. at 7-218 to 7-221.

Unsatisfied with Gordon's statements, the court called the jury back into the courtroom, struck Hevia's testimony, and instructed the jury not to consider it. Id. at 7-223. At the hearing on the present motion, Elliot's new counsel has agreed that it was proper to strike Hevia's testimony under the circumstances.

After the court struck Hevia's testimony, the defense rested, and there was brief rebuttal evidence. At the end of the trial day, which was Thursday, April 15, 2004, the Government indicated that it would continue with its rebuttal evidence on the next trial day. The next trial day was scheduled to be the following Tuesday, April 20, 2004, as the trial judge was scheduled to attend the district's annual conference on Friday, April 16, 2004, and the next Monday, April 19, 2004, had been reserved for the court's usual motions and sentencing calendar.

14

Thus, there would be a gap of four days before the trial could resume.

Before proceedings ended that Thursday, April 15, 2004, Gordon announced that he would be moving for a mistrial, but that he wanted to spend the weekend researching the issues before making the motion. Id. at 7-223 to 7-224. The court offered the attorneys a time on Monday, April 19, 2004, to hear Elliot's motion for mistrial. Ultimately, however, Elliot decided not to file such a motion.

Some time before April 20, 2004, local counsel for Elliot, Philip H. Lowenthal, alerted the courtroom manager that he would be filing a motion to withdraw as counsel, which he in fact filed on April 20, 2004. In support of his motion, Lowenthal attached his declaration, stating, "I am informed and believe that the record, (although I was not physically in the courtroom) indicates at least the appearance of a conflict of interest for Richard Gordon arising out of representation of both Defendant Elliot and witness Sergio Hevia." Declaration of Philip H. Lowenthal (April 19, 2004) ¶ 4. He further stated, "Assuming the testimony of Mr. Hevia to be true, in my opinion, Mr. Gordon's undisclosed dual representation contributed to the loss to Defendant Elliot of vital evidence essential to the theory of his defense." Id. ¶ 5.

While Elliot opted not to seek a mistrial, the Government sent a letter to the court urging it to declare a mistrial. No proceedings were held on April 19, 2004, but the court scheduled a conference with the attorneys and parties for 8:30 a.m. on Tuesday, April 20, 2004, before the jury was scheduled to convene for the continuation of the rebuttal evidence. The court faxed a letter to the attorneys on April 19, 2004, in which the court asked the attorneys to address the following:

> 1. Is a mistrial warranted given the particular circumstances before us? Ms. Sameshima's letter refers to cases that involve circumstances different from those before us. In the first place, here we have a defense witness, not, as in Ms. Sameshima's cases, a government witness or someone whose guilt might exonerate the defendant. In the second place, we have a witness whose testimony has been stricken. Please come to tomorrow's proceeding prepared to discuss **(and to cite authorities concerning)** whether these circumstances affect the advisability of a mistrial. I would appreciate correspondence from counsel no later than 4 p.m. identifying case authorities that will be relied on. Letters may be faxed to me (with copies of the letters to opposing counsel) at 541-1724. Cases need not be attached to the letters.

> 2. Would Mr. Elliot object to the declaration of a mistrial?

> 3. Is Mr. Elliot now waiving any possible conflict of interest or other potential problem associated with Mr. Gordon's representation of Mr. Hevia? The court suggests that, before deciding on any waiver, Mr. Elliot consult not only with

16

Mr. Gordon on this point, but also separately
with Mr. Lowenthal.

4.   What is Mr. Elliot's position
on Mr. Lowenthal's motion to withdraw as
counsel?  Defense counsel should discuss this
matter with Mr. Elliot.  If Mr. Elliot would
like to consult with independent counsel, he
should so inform me at tomorrow's conference.

See Letter from this court to counsel (April 19, 2004), attached

as Exhibit A to Government's Memorandum in Opposition to Motion

to Dismiss Indictment, filed on September 17, 2004.

At the conference on April 20, 2004, the Government,

while refraining from itself moving for a mistrial, urged this

court to declare a mistrial sua sponte.  See Transcript of

Proceedings (April 20, 2004) at 8-6 to 8-8.  Elliot objected to a

declaration of mistrial.  Id. at 8-8.  The court then told

Elliot, and made sure Elliot understood, that he had a right to

conflict-free counsel and that Gordon might or might not have a

conflict of interest.  The court explained that such a conflict

could mean that Gordon was not representing Elliot with all of

the zeal that Gordon should be employing, as Gordon might have

been restrained by loyalty to Hevia.  Id. at 8-8 to 8-12.

The court then extensively questioned Gordon and Elliot

regarding the questions posed in its April 19 letter.  Through

his counsel, Gordon, Elliot indicated that he was opposing his

local counsel's motion to withdraw.  Id. at 8-14.  Elliot

insisted on keeping both Gordon and Lowenthal as his trial

17

attorneys, was not waiving any conflict, and was objecting to a
mistrial. Id. at 8-14 to 8-15.

The court asked the parties whether an actual conflict
or only a potential conflict was required to justify a
declaration of mistrial. Id. at 8-16. The Government argued
that, given the state of the record, the court could never know
whether, because of his apparently conflicting loyalties, Gordon
had failed to explore a number of questions with Hevia on direct
examination that would have helped Elliot. The Government
pointed out that, because Elliot was refusing to take a position
on whether there was or was not a conflict, the court was being
"whipsawed." That is, if the trial continued and Elliot were
convicted, Elliot would have a built-in appellate issue based on
the lack of conflict-free counsel. If the court declared a
mistrial, Elliot would argue that his double-jeopardy rights were
being violated. Id. at 8-17 to 8-18.

Elliot took no position on whether an actual conflict
was required for a mistrial, or whether a potential conflict
sufficed. Similarly, Elliot was silent on the question posed by
the court's letter concerning the effect, if any, of the court's
striking of Hevia's testimony on the issue of whether a mistrial
should be declared.

The court specifically asked Elliot whether, if the
trial proceeded, Elliot's position was that his counsel would be

free of conflict.  Gordon responded: "Mr. Elliot has not waived that."  Id. at 8-18.  When the court pointed out that it had asked a yes or no question, Gordon stated: "Yes, I understand it's a yes-or-no question.  That doesn't mean that, as Mr. Elliot's attorney, I don't get to stop and think and try to phrase an answer that is in my client's best interest."  Id.  The court then asked for a yes or no answer, to which Gordon responded, "Your Honor, Mr. Elliot has not waived anything.  He has not made a statement consistent with the premise in your question."  Id. at 8-18 to 8-19.

Gordon repeated this response to additional questions posed by the court as to the existence of a conflict.  The court asked, "So he is taking no position on whether you have or do not have a conflict of interest.  Am I correct?"  Gordon replied, "His position is that he's not waiving it and that he's specifically reserving all his rights."  Id. at 8-19.  The court pointed out that Gordon was not answering the question about what Elliot's position was with respect to whether there was or was not any conflict.  Gordon continued to refuse to explain, saying only, "He has no position further than what has been articulated."  Id. at 8-20.

The Government then argued that it believed that Gordon's conduct demonstrated that he did indeed have a conflict and that his actions were that of an attorney trying to cover

"his own tail." Id. at 8-21 to 8-22. The court once again asked

Gordon whether he had a position as to the existence of a

conflict:

> THE COURT: . . . Now I'm asking for your
> statement on behalf of yourself.
>
> MR. GORDON: I'm not taking – I have not taken
> a position, if that's what you asked.
>
> THE COURT: Okay. So you are not admitting
> nor are you denying that you are in a
> conflict-of-interest position.
>
> MR. GORDON: I'm not taking a position; that's
> correct.
>
> THE COURT: Right. So, if you're not taking a
> position, you are neither admitting nor
> denying that you are in a conflict of
> interest position. If you are not denying
> that you have a conflict of interest, then I
> feel that there is a grave cloud over your
> continuing to represent a client.
>
> First of all, you're not denying there's
> a conflict. Second, he's not waiving any
> possible conflict. This seems to me that you
> want your cake and eat it too. You want to
> go forward with the trial. If, in fact,
> Mr. Elliot is convicted, then Mr. Elliot will
> then declare that you were in a conflict of
> interest and take an appeal. This is a waste
> of the court's time, a waste of valuable
> jurors' time, and I really feel like there's
> just a ton of games-playing right now.

Id. at 8-22 to 8-23.

> Given this background, the court then stated:
>
> There seems to me to be a conflict of
> interest, at least a potential one, between
> Mr. Hevia and Mr. Elliot, both of whom are
> represented by Mr. Gordon. There seems to me
> also now to be a problem between Mr. Gordon's

> protecting himself and Mr. Gordon's duty to
> represent Mr. Elliot vigorously.
> Mr. Lowenthal has already indicated that he
> wishes to withdraw and does not feel he can
> go forward under these circumstances.  That
> would mean then that to be entitled--to be
> [assured] of conflict-free representation
> Mr. Elliot would have to get a new attorney.
> Such a new attorney could not come into this
> trial in the middle of it and proceed in any
> way that would make sense while we kept the
> same jury.  Under those circumstances I think
> there is a manifest necessity for a mistrial,
> and I see no way out of it.
>
> Would anyone like to be heard before I
> make a final ruling?  I'm happy to hear from
> either side on positions, on arguments, or on
> alternatives.

Id. at 8-24 to 8-25.  Neither party made any further statement.

Id. at 8-25.

The court then orally declared a mistrial and

discharged the jury.  Id. at 8-27.  A written order followed.

This order was prepared quickly by the judge herself, without

briefing by the parties.  The court was attempting to memorialize

its thought process and to state the circumstances before time

made them unclear.  The court also wanted to get the order out as

quickly as possible in case Elliot wanted to retain new counsel.

It was the court's thought that a written order would assist new

counsel in understanding what had happened and in determining

whether to enter the case.  The court did not want new counsel to

have to rely on reports by Gordon or by Elliot, and transcripts

of trial proceedings and the April 20 hearing might not have been
immediately available.

      In its written order, the court stated:

> This court declares a mistrial in this
> drug case, having found a manifest necessity
> to do so for the purposes of (1) ensuring
> that Defendant Basho Elliot, who has not
> waived his objection to any conflict of
> interest, is represented by conflict-free
> counsel, (2) avoiding the undermining of
> public confidence in the integrity of the
> legal system, and (3) avoiding a waste of the
> resources of the court, the jurors, and the
> parties.  The court finds that the ends of
> public justice would not be served by
> continuing the proceedings.  <u>See</u> <u>United
> States v. Jorn</u>, 400 U.S. 470, 485 (1971).  If
> this trial proceeded and Defendant were found
> guilty, Defendant would undoubtedly appeal on
> the ground that his counsel had a conflict of
> interest that made any judgment unjust, and a
> retrial would almost certainly be ordered.
> Under those circumstances, the present trial
> should not proceed.  <u>See</u> <u>Illinois v.
> Somerville</u>, 410 U.S. 458, 463 (1973).

Order Declaring Mistrial (April 21, 2004) at 1.

      The court noted that it was faced with the following
six circumstances:

> 1. lead defense counsel had at least a
> potential conflict of interest, which the
> court outlined for Defendant; 2. local
> defense counsel was seeking to withdraw and
> was, in any event, not prepared to proceed
> with the trial without lead defense counsel;
> 3. Defendant was preserving all his rights,
> including his right to be represented by
> conflict-free counsel (that is, Defendant was
> not waiving any conflict of interest);
> 4. Defendant was insisting on being
> represented at trial by lead defense counsel,
> even in the face of a potential conflict of

22

interest; 5. Defendant was objecting to a
mistrial; and 6. lead defense counsel himself
was not denying that he had a conflict of
interest.  The court concluded that, in
objecting to a mistrial under the preceding
circumstances, Defendant was trying to force
a retrial if a conviction resulted.

Id. at 5-6.

The court concluded:

During the discussion of a possible mistrial,
if lead defense counsel thought that
Defendant had not been adversely affected by
any perceived conflict, lead defense counsel
had every reason to argue that point
vigorously.  He made no such argument.
Instead, he only repeated that Defendant was
preserving all his rights, declining
elaboration.  Either lead defense counsel did
not recognize the problem, or he did
recognize it but was protecting himself or
trying to preserve an appellate issue by
simply refusing to explain the basis of his
position. [Footnote omitted.]  As long as
Defendant is represented by lead defense
counsel, Defendant is either being influenced
by counsel who cannot or will not clarify the
problem, or Defendant, on the advice of that
counsel, is playing games for strategic
advantage.  A trial under those conditions
would be a travesty.

Id. at 10.

Although the court's written order did not expressly

state that Hevia had committed perjury or that Gordon had

suborned perjury by offering Hevia's testimony, the order clearly

conveyed the court's concern that Hevia's testimony was

implausible.  It was, after all, a nearly inconceivable

coincidence that Hevia would call an attorney to discuss concerns

23

about Meston, and that the attorney Hevia called would be trial counsel in a case in which the opposition's main witness was Meston.  It was similarly highly implausible that Hevia could not remember basic details, such as the names of the friends he had traveled to Maui with.  Such details would have allowed an investigation into the truth of what he said.  While the court admittedly is in no position to determine whether Hevia committed perjury, if Hevia did do that and if Gordon had reason to know that, Gordon's interest in protecting himself would certainly have made it nearly impossible for him to represent Elliot zealously.

The court granted local counsel's motion to withdraw and, after declaring a mistrial, addressed the issue of whether Gordon could remain as trial counsel.  Gordon at first took the position that he would continue on as trial counsel, but, after the Government filed a motion to disqualify Gordon, he voluntarily withdrew.  Elliot then hired a new lead trial attorney, who was admitted pro hac vice, and a new local attorney.  A new trial date was set.

New counsel has filed the present motion to dismiss the indictment, arguing that a new trial would violate the double jeopardy prohibition.  Elliot now argues that any conflict of interest was cured by the court during trial and before a mistrial was declared.  At the hearing on the present motion,

24

counsel for Elliot admitted that a conflict had indeed been created by Gordon's representation of Elliot and Hevia.  However, Elliot's position is that the conflict evaporated once the court appointed separate counsel for Hevia and struck his testimony.

Elliot also argues on the present motion that, because Hevia's testimony was favorable to Elliot and only incriminated the chief Government witness, Meston, no conflict existed.  This argument, made in the moving papers, appears inconsistent with the admission of a conflict made at the hearing.

In addition, Elliot argues that the mistrial only protected Hevia at Elliot's expense, that reversal based on any purported conflict would not have been a certainty had the trial continued and Elliot been convicted, and that the court should not have found a manifest necessity for a mistrial based on any credibility concerns about defense witnesses.

III.    ANALYSIS.

A.   Elliot Has Waived The Arguments He Now Makes.

Elliot's arguments are barred because he did not make them before the court declared a mistrial, even though the court pressed him for the basis of his objection to the declaration of a mistrial.  In the face of question after question from the court, Elliot's counsel stated adamantly that Elliot was not waiving any rights and was preserving all objections.  There was no further explication, either factual or legal.

Elliot leads off his motion with the argument that any conflict that may have existed was eliminated when the court struck Hevia's testimony. This is followed by his argument that a conflict could not have existed with a defense witness who only incriminated Meston. These are prime examples of arguments that have been waived. The court, in its letter dated April 19, 2004, specifically asked counsel, "Is a mistrial warranted given the particular circumstances before us? . . . In the first place, here we have a defense witness . . . . In the second place, we have a witness whose testimony has been stricken." The court's letter stated, "I ask that counsel examine [these] issues." In the face of this request, Elliot stood silent on the matter.

It is only now, after a mistrial has been declared, that Elliot addresses these issues. The court cannot fathom how Elliot can decline to address issues squarely presented by the court, then, upon receiving the court's ruling, argue that the ruling was incorrect based on the very points he previously refused to discuss.

Even having four days before the April 20 conference in which to conduct research about the subject of a mistrial, Gordon took no position as to whether a conflict of interest existed. Nor did he provide the court with any information about his representation of Hevia. While certain matters may well have been privileged, it is not clear to the court that all matters

26

were privileged.  For example, Hevia may have been a former
client, not an ongoing client.  Gordon may have taken Hevia's
call about Meston only because of that prior relationship.  When
Hevia mentioned Meston, Gordon might have immediately declined to
represent Hevia.  For all the court knows, Gordon, after making
sure that Hevia understood that Gordon was not representing him,
might have talked to Hevia about Meston only in Hevia's capacity
as a witness.  If this happened, it would not have been the
subject of any privilege.  But if it happened, Elliot did not
give the court the benefit of knowing it before the court
declared a mistrial.

All Gordon would do, even under extensive questioning,
was state that his client would not waive any conflict that may
have existed.  Gordon, at least until counsel was appointed for
Hevia during trial, could have been simultaneously representing
both Elliot, the defendant, and Hevia, a witness, while the trial
was progressing.

Uncertain of the nature of the relationship between
Gordon and Hevia, the court could not help but be concerned that
there was at least a potential conflict that was affecting how
vigorously Gordon was examining Hevia at trial or was making
strategic trial decisions.  Gordon may no t have elicited all of
the favorable testimony he could have gotten from Hevia.  Gordon
may have refrained from asking certain questions that might have

27

helped Elliot but that might have hurt Hevia.  Gordon's intransigence prevented the court from determining what the actual facts surrounding the conflict were.

Nor was Gordon any more forthcoming with respect to any legal position.  He cited no law and laid out no analysis in objecting to a mistrial.  Elliot's position was only that he was not waiving his rights, including his right to conflict-free counsel.

If Elliot may belatedly explain his rationale in objecting to a mistrial, attorneys during trial would always limit themselves to saying, "I object," and then refuse to explain the basis of the objection.  If the attorneys could then later complain about rulings and belatedly explain why they had objected, they would make a mockery of the prior proceedings. States might just as well license parrots who could squawk, "Objection!" every few seconds, for that would then be sufficient to preserve all allegations of error.  District court proceedings would be totally lacking in substance, and parties would not have the benefit of actual advocacy.  Instead, they would be paying legal fees for mere parrots.

The court is certainly aware that the court itself has obligations to act within the law.  That obligation is the basis of reversals on appeal for plain error.  But plain error normally

occurs when a party has failed to point out an error to the
court, and the court itself has not recognized its error.  See
United States v. Dipentino, 242 F.3d 1090, 1094 (9th Cir. 2001)
("We have the authority to reverse a conviction under Federal
Rule of Criminal Procedure 52(b) when: (1) there was an error,
(2) the error was plain, and (3) the error affected the
defendant's substantial rights."); United States v. Turman, 122
F.3d 1167, 1170 (9th Cir. 1997) ("Plain error, as we understand
that term, is error that is so clear-cut, so obvious, a competent
district judge should be able to avoid it without benefit of
objection.").  In this case, by contrast, the court recognized
the problem, invited counsel to state and explain a position, and
was met with unadorned statements that Elliot objected.  The
court sees that as a waived objection.

          The waiver is seen clearly when one notes the
similarities between the present situation and the "invited
error" situation.  In Sovak v. Chugai Pharm. Co., 280 F.3d 1266,
1270 (9th Cir. 2002), the Ninth Circuit explained, "The invited
error doctrine holds that one may not complain on review of
errors below for which he is responsible."  Thus, in United
States v. Reyes-Alvarado, 963 F.2d 1184, 1187 (9th Cir. 1992),
the Ninth Circuit noted that, when counsel asked questions about
post-arrest statements made by a co-defendant that he thought
might benefit his client, and the tactic backfired, the client

                              29

who was then convicted could not complain about the tactic on
appeal.  Calling any error "defense-induced," the Ninth Circuit
said, "A defendant cannot have it both ways.  This was invited
error and therefore not grounds for reversal."  Id.  The Ninth
Circuit therefore determined that the defendant had waived the
right to complain that the court had allowed him to elicit
testimony about post-arrest statements made by a co-defendant.
Id.

          Under the invited error doctrine, a court focuses on
whether the defendant induced or caused the error, as well as on
whether the defendant intentionally relinquished or abandoned a
known right.  When a defendant has both invited the error and
relinquished a known right, the error is waived and unreviewable.
United States v. Perez, 116 F.3d 840, 845 (9th Cir. 1997) (en
banc).  By contrast, an error caused by a defendant that the
defendant is unaware of is not waived, but merely forfeited and
therefore reviewable for plain error.  Id. at 846.  Here, the
refusal of Elliot and Gordon to respond to questions about
whether a conflict necessitated a mistrial is akin to an
intentional abandonment by Elliot of an argument that there was
no conflict necessitating a mistrial.

          Instead of explaining to the court why no conflict
existed, Elliot in essence invited the court to declare a
mistrial by refusing to even deny that a conflict existed.  By

30

refusing to take any position as to whether a conflict existed, and by asserting all his rights, including the right to conflict-free counsel, Elliot was taking the position that, if a mistrial was declared, Elliot should go free on double jeopardy grounds. At the same time, if a mistrial was not declared and Elliot were convicted, Elliot appeared to be banking on being able to get the conviction vacated on the ground that his counsel had had a conflict. Elliot was inviting error no matter which way the court ruled; he may not now raise arguments he declined to make then.

While Elliot now also argues that no conflict of interest existed because Hevia's testimony was helpful to his case, this argument was also waived when Elliot failed to respond to a direct question by the court regarding whether the fact that Hevia was a defense witness made a difference in determining the advisability of a mistrial. See Letter from the court to Counsel (April 19, 2004), question 1.

Elliot similarly waived his present argument that there was no manifest necessity for a mistrial because there was no conflict that made reversal on appeal a certainty. Before declaring a mistrial, the court had asked Elliot whether a mistrial was warranted given the particular circumstances. See Letter from the court to Counsel (April 19, 2004), question 1. Elliot provided no answer to that question.

31

Elliot also argues in the present motion that the court erred by declaring a mistrial that protected Hevia's rights at Elliot's expense. Elliot made no such argument to the court when the court inquired whether a mistrial should be declared. Again, this argument has been waived. The court notes that, in any event, the argument is contrary to fact. Before declaring a mistrial, the court clearly articulated at least the potential conflict that could harm Elliot.[1] Elliot did not deny the existence of that conflict, though given many opportunities to do so by the court. In addition, Elliot declined to waive that potential conflict. Elliot's present argument that the mistrial provided no protection to him is contrary to the position he took before the court declared a mistrial, a position that was premised on preserving any rights he had relating to a possible conflict.

> B.    The Court Did Not Declare a Mistrial Simply
>        Because It was Concerned About the Credibility of
>        Certain Defense Witnesses.

Elliot's present motion also complains that the court's concern about the credibility of defense witnesses does not constitute a manifest necessity for a mistrial. This is the only

---

[1] The court reiterated its concerns about Elliot's interests in the Order Granting Mistrial. In that order, the court said that it was finding a manifest necessity for a mistrial to, among other things, ensure that Elliot, who had not waived his objection to any conflict of interest, was represented by conflict-free counsel. Order Granting Mistrial (April 21, 2004) at 1.

argument that arguably was not waived.  The court says this
because the court admittedly did not tell Elliot before declaring
a mistrial that the court's decision was influenced by concern
about the credibility of defense witnesses.  It was only in the
written order that followed the court's oral declaration of a
mistrial that the court mentioned that its concerns about
credibility were related to its ruling.  Nevertheless, this
argument is unpersuasive because it misses the point.

     The court agrees that there is no authority allowing a
court to declare a mistrial just because the court thinks defense
witnesses are unbelievable.  The court looked to the witnesses'
credibility here, however, only because it affected the court's
evaluation of whether Gordon had at least a potential conflict.
If the witnesses were testifying truthfully, then there were two
possible conflicts.  The first was the conflict created by
Gordon's potentially divided loyalty between his two clients,
Hevia and Elliot.  The second was the conflict between Gordon's
interest in avoiding charges of unethical conduct that might
jeopardize his license to practice law, and his duty to represent
Elliot zealously.  However, if the witnesses were lying, then
Gordon had an additional conflict.  This additional conflict was
a drastic expansion of the self-interest conflict noted above, as
the additional conflict could implicate criminal charges.  This
third conflict involved the conflict between his self-interest in

preventing himself from being connected (rightly or wrongly) to the crime of perjury, and his duty to represent Elliot zealously. The court's concern about credibility was great enough that the court raised the possibility of perjury in its written order. This concern in turn gave rise to the potential for this third conflict on Gordon's part.

Even if Elliot could not be said to have waived the argument that credibility determinations do not justify a mistrial, that argument has no place here because no mistrial was declared based on the court's disbelief of any witness. Elliot's argument misses a step. While the court did indeed have credibility concerns, Elliot ignores the connection between those credibility concerns and what appeared to be a third conflict. It was the existence of all of these potential conflicts, which Gordon refused to deny, combined with Elliot's decision not to waive any conflict and the assertion of all his rights, including his right to conflict-free counsel, that led to the declaration of a mistrial.

C.    The Mistrial Was a Manifest Necessity.

Even assuming that Elliot did not face a waiver problem with most of his arguments, those arguments, examined on their merits, are unconvincing. A new trial does not expose Elliot to double jeopardy, as he argues.

The Fifth Amendment's Double Jeopardy Clause prohibits successive prosecutions for the same criminal offense.  See United States v. Dixon, 509 U.S. 688, 695-96 (1993).  In a jury trial, jeopardy attaches when the jury is empaneled and sworn. Thomas v. Municipal Court of the Antelope Valley Judicial Dist. of Cal., 878 F.2d 285, 287 (9th Cir. 1989).  However, when, as in this case, a mistrial has been declared over a defendant's objection after jeopardy has attached, a defendant may still be reprosecuted without infringing the Double Jeopardy Clause if the trial was terminated because of manifest necessity.  Id.

Whether a manifest necessity for a mistrial existed is not determined by the application of any mechanical formula, but rather on a case-by-case analysis.  Illinois v. Somerville, 410 U.S. 458, 462 (1973).  Calling for a "general approach," the Court stated:

> A trial judge properly exercises his
> discretion to declare a mistrial if an
> impartial verdict cannot be reached, or if a
> verdict of conviction could be reached but
> would have to be reversed on appeal due to an
> obvious procedural error in the trial.  If an
> error would make reversal on appeal a
> certainty, it would not serve 'the ends of
> public justice' to require that the
> Government proceed with its proof when, if it
> succeeded before the jury, it would
> automatically be stripped of that success by
> an appellate court.

35

Id. at 464; accord Wilcox v. McGee, 241 F.3d 1242, 1245 (9ᵗʰ Cir. 2001) (manifest necessity exists only when an error would make reversal on appeal a certainty).

This approach recognizes that a defendant's right to have his trial completed by a particular jury must sometimes "be subordinated to the public's interest in fair trials designed to end in just judgments." United States v. Jorn, 400 U.S. 470, 580 (1971). In exercising its discretion in evaluating whether it should grant a mistrial, a court must consider the "important factor" of "the need to hold litigants on both sides to standards of responsible professional conduct in the clash of an adversary criminal process." Id. at 485-86.

The Ninth Circuit has found manifest necessity supporting a mistrial under circumstances similar to those presented during Elliot's trial. In Thomas, an attorney defended a husband in a criminal case in which the husband was charged with having assaulted and battered his wife. This was the wife's second husband, and she had been represented in her divorce from her first husband by the same attorney who was defending her second husband in the criminal case. This same attorney was also representing the second husband in divorce proceedings from the wife even while providing a defense in the criminal case.

In his opening statement to the jury in the criminal case, the attorney said that the wife had fabricated the assault

charges in retaliation for allegations by the husband in the divorce proceedings that the wife was a bigamist, having married the husband before her divorce from her first husband became final.  Subsequently, in a discussion in chambers, the attorney revealed that he had represented the wife in her initial divorce proceedings.  The prosecution then moved for a mistrial based on the conflict of interest by the attorney.  The attorney denied the existence of such a conflict, saying that he would abandon the bigamy motive defense.  The court declared a mistrial. Thomas, 878 F.2d at 286.  The husband then claimed that a retrial was barred by the Double Jeopardy Clause.

The Ninth Circuit concluded that the trial court had not erred in declaring a mistrial based on manifest necessity, as the husband had not agreed to waive the conflict.  In so concluding, the Ninth Circuit first examined whether a conflict existed, noting that every criminal defendant has a Sixth Amendment right to assistance of counsel "unhindered by a conflict of interest."  Id. at 288 (quoting United States v. Wheat, 813 F.2d 1399, 1402 (9th Cir.), aff'd on other grounds, 486 U.S. 153 (1987)).  The Thomas panel examined whether the attorney had confidential information about the wife, his former client.  It also noted that the attorney's current client, the husband, had the right to expect that his lawyer would "use every skill, expend every energy, and tap every legitimate resource . .

. in undertaking representation on his client's behalf." Id. at

289.  The attorney's proposal to abandon the bigamy motivation

defense underscored what the Ninth Circuit viewed as the

attorney's ethical dilemma in the case.  Id. at 290.

> The Ninth Circuit stated:
>
> Had the trial court simply proceeded with the
> trial, reversible error would have been built
> in because the record would have demonstrated
> that Dr. Thomas[, the husband,] did not have
> effective, conflict-free representation.  We
> should be aware of the trial court's
> prospects of being "whip-sawed" by assertions
> of error no matter which way it rules.

Id.

At the hearing on the present motion to dismiss,

Elliot's new counsel admitted what Gordon had refused to admit or

deny--that Gordon had had some type of conflict, at least until

Hevia's testimony was stricken.  It was unclear from the facts

that developed during the cross-examination of Hevia whether

Gordon had simultaneously represented Hevia and Elliot, or

whether there had been successive representation of Hevia and

Elliot.  There clearly was, in either event, the potential for

conflicting interests between Hevia and Elliot, as well as the

potential for conflicting interests between Elliot and Gordon.

Gordon initially represented to the court that Hevia

did not have an attorney.  See Testimony of Sergio Hevia (April

15, 2004) at 7-109.  It therefore came as a surprise to the court

to learn from Hevia that, having been represented a few years

earlier by Gordon in connection with traffic tickets, he had
sought legal advice from Gordon regarding conversations with
Meston about the package at issue in this case. <u>Id.</u> at 7-180 to
7-185, 7-196. Hevia's testimony gave the court concern that
Hevia, even while testifying as a witness in this case, was
relying on Gordon as counsel. The court was, however, unable to
obtain information from Gordon about the nature of his
relationship with Hevia. <u>Id.</u> at 7-191. Gordon stated that he
could not provide details about his representation of Hevia
because he "had issues of confidentiality." <u>Id.</u> at 7-192. The
court was therefore faced with the possibility that Gordon was
representing both Elliot and Hevia at the time of trial. To
ensure protection of Elliot's Sixth Amendment right to conflict-
free counsel, the court had to assume this was so. Elliot now
concedes that some kind of conflict existed, at least before the
court struck Hevia's testimony.

Gordon also gave the clear impression that his personal
interests were adverse to Elliot's. Instead of denying that
there was a conflict, Gordon refused to take a position on the
question of whether there was or was not a conflict. The court
actually expected a vigorous denial of a conflict, and when that
was not forthcoming and instead Elliot said that he was
preserving all his rights, the court had to conclude that Gordon
was concerned about himself.

39

Elliot argues that there was no manifest necessity supporting the mistrial. He says that a mistrial was unwarranted because, had the trial proceeded and had he been convicted, reversal on appeal would not have been a certainty. There may well have been explanations that, had they been provided to the court before it declared a mistrial, would have assured the court that a reversal would not have been a certainty. However, the court received no such explanations.

The Supreme Court has stated, "Defense counsel have an ethical obligation to avoid conflicting representations and to advise the court promptly when a conflict of interest arises during the course of trial." Cuyler v. Sullivan, 446 U.S. 335, 346 (1980). Courts therefore usually rely on the good faith and judgment of defense counsel to determine whether a conflict exists because that counsel "is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of a trial." Id. at 347. "Unless the trial court knows or reasonably should know that a particular conflict exists, the court need not initiate an inquiry." Id. Unfortunately, in the present case, Gordon did not provide the court with information that could have avoided a mistrial. Instead, Hevia's testimony came as a surprise to the court in the midst of trial. That testimony

40

raised serious concerns that Gordon and Elliot did nothing to dispel.

Elliot now argues that a reversal of any conviction would not be a certainty because there is no evidence that Gordon's performance would have been adversely affected by any conflict. Elliot relies on Mickens v. Taylor, 535 U.S. 162, 173-74 (2002), in which the Supreme Court held that the trial court's failure to inquire into a potential conflict of interest on the part of the defendant's attorney, about which the court knew or reasonably should have known, did not automatically require reversal of the conviction. Instead, to void the conviction, the defendant had to establish that the conflict of interest had adversely affected his counsel's performance. Id.; Cuyler v. Sullivan, 446 U.S. 335, 348 (1980) ("In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance."). Elliot's argument is that, just as the lawyer's conflict in Mickens did not support a reversal, Gordon's conflict in the present case did not make a reversal a certainty.

The court notes that it is not at all clear that the reasoning in Mickens, which was a habeas corpus case under 28 U.S.C. § 2254, applies to the mistrial situation. In other words, a reversal of a conviction in a habeas case may be much

41

harder to obtain than a reversal in a direct appeal of a criminal conviction.  See Engle v. Isaac, 456 U.S. 107, 134-35 ("The federal courts apply a plain-error rule for direct review of federal convictions.  Fed. Rule Crim. Proc. 52(b).  Federal habeas challenges to state convictions, however, entail greater finality problems and special comity concerns.  We remain convinced that the burden of justifying federal habeas relief for state prisoners is greater than the showing required to establish plain error on direct appeal.") (internal quotation omitted); Lindh v. Murphy, 521 U.S. 320, 334 n.7 (1997) (noting that the Antiterrorism and Effective Death Penalty Act, 28 U.S.C. § 2254(d), imposes a "highly deferential standard for evaluating state-court rulings").  Even assuming that the certainty of a reversal should be measured by the same standard in habeas cases and in direct appeals, Mickens does not establish that reversal would not have been a certainty in the present case.

The court's own observations of Gordon's actions gave the court concern that the conflict was indeed adversely affecting Gordon's performance.  In its written order declaring a mistrial, this court was struggling to determine whether Gordon had actual conflicts of interest.  The court's effort was hampered by Gordon's refusal to fulfill his duty to advise the court about his conflicts.  See Holloway v. Arkansas, 435 U.S. 475, 485 (1978) ("defense attorneys have the obligation, upon

42

discovering a conflict of interests, to advise the court at once of the problem"). This court attempted to determine the nature and extent of Gordon's conflicts so that it could "take adequate steps" to protect Elliot's rights. See id. at 484. Gordon's refusal to deny that he had conflicts was, for purposes of the court's analysis, tantamount to an admission that the potential conflicts the court envisioned were actual conflicts. To have proceeded under those circumstances, especially when Elliot appeared to be under Gordon's control, would not have protected Elliot's constitutional rights.

What Elliot now concedes was the conflict Gordon had, at least until Hevia's testimony was stricken, certainly affected Gordon's performance. Gordon refused to answer any of the court's numerous questions regarding whether the court should strike Hevia's testimony. Instead, Gordon put forth an incomprehensible objection to the striking of the testimony, refusing to explain what he was saying. The court can only conclude that Gordon adopted this strategy either to protect client confidences or to cover himself.

Even accepting Elliot's position on this motion that the conflict arising out Gordon's representation of Elliot and Hevia was cured when the court struck Hevia's testimony, there was still the conflict between Gordon's personal interests and his duty to Elliot. Even after Hevia's testimony was stricken,

43

Gordon refused to state whether he had a conflict of interest.
If Elliot's present argument is correct and there was no longer
any conflict relating to Gordon's divided loyalties to Hevia and
Elliot, Gordon's refusal can be explained only as an attempt to
protect himself.  At that point, Gordon had to be concerned that
at least ethical charges might be brought against him.  The
refusal did not advance Elliot's case.  In fact, the refusal at
that point hurt Elliot by giving the court the impression, which
the court clearly expressed before deciding to declare a
mistrial, that Elliot was attempting to create appellate issues.
Gordon's insistence on continuing his refusal to respond to the
court's questions was evidence that there was an ongoing conflict
between Gordon himself and his client.  A reversal under these
circumstances was indeed a certainty, assuming that is the
correct standard.  The ends of justice were most certainly not
served by the continuation of the proceedings.  See Jorn, 400
U.S. at 485.

IV.        CONCLUSION.

For the foregoing reasons, Elliot's motion to dismiss

is denied.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, October 1, 2004.

SUSAN OKI MOLLWAY
UNITED STATES DISTRICT JUDGE

United States v. Elliot, Cr. No. 03-00244 SOM; ORDER DENYING MOTION TO DISMISS
ON DOUBLE JEOPARDY GROUNDS