1                    IN THE UNITED STATES DISTRICT COURT

2                      FOR THE DISTRICT OF HAWAII

3                                    )
     UNITED STATES OF AMERICA,       )   CR 03-00244 SOM 01
4                                    )
                Plaintiff,           )   Honolulu, Hawaii
5         vs.                        )   April 9, 2004
                                     )   8:45 A.M.
6    BASHO ELLIOT,                   )
                                     )   VOLUME IV
7                Defendant.          )
                                     )
8    _____)

9
                         TRANSCRIPT OF JURY TRIAL
10            BEFORE THE HONORABLE SUSAN OKI MOLLWAY
                  UNITED STATES DISTRICT JUDGE
11

12   APPEARANCES:

13   For the Government:          BEVERLY WEE SAMESHIMA, ESQ.
                                  Office of the U.S. Attorney
14                                PJKK Federal Bldg.
                                  300 Ala Moana Blvd. Ste. 6100
15                                Honolulu, HI 96850

16   For the Defendant:          RICHARD H. GORDON, ESQ.
                                  9777 Wilshire Blvd. Ste. 1000
17                                Beverly Hills, CA 90212

18                                PHILIP H. LOWENTHAL, ESQ.
                                  Lowenthal & August
19                                33 N. Market St., Ste. 101
                                  Wailuku, HI 96793
20
     Official Court Reporter:    Debra Kekuna Chun, RPR, CRR
21                                United States District Court
                                  300 Ala Moana Blvd. Ste. C285
22                                Honolulu, HI 96850
                                  (808) 534-0667
23

24
     Proceedings recorded by machine shorthand, transcript
25   produced with computer-aided transcription (CAT).

# EXHIBIT F

1    evidence.  But did anybody want me to have asked anything?

2              MR. GORDON:  No, Your Honor.

3              MS. SAMESHIMA:  No, Your Honor.

4              THE COURT:  Okay.  Then we're going to go to the

5    legal issues.

6              First of all, with respect to any authorities on

7    the defense position that the prosecution may not even

8    mention the fact of giving Miranda rights and the

9    defendant exercising those rights, are there any

10   authorities to be cited to me?  If there are, we'll pull

11   it right up, and I'll look at those.

12             MR. LOWENTHAL:  I'd like you to -- I'm sorry I

13   didn't have time to exhaustively research this, but I did

14   find the basic case of Doyle versus Ohio at 426 U.S. 610

15   and 96(b) Supreme Court 2240.

16             THE COURT:  The 426 U.S. 610 is enough.  My law

17   clerk will get it, and I'll look at it.

18             MR. LOWENTHAL:  Okay.  I'd actually -- that's

19   the only case I have then.  I'd like to argue about it

20   if -- when we get there.

21             THE COURT:  Okay.  We'll print up two copies,

22   and I'll give one to the government, too.

23             In the meantime, while he's doing that --

24             MR. LOWENTHAL:  Doyle is spelled D-O-Y-L-E.

25             THE COURT:  While he's printing that up, I will

1    say that I did get a brief from the government on its

2    issue about whether the defense opens the door about the

3    failure to have investigated Mr. Meston further, and the

4    government's position is that that would allow it to bring

5    in Mr. Elliot's pre-Miranda statement.  Did you get that

6    memo?

7              MR. GORDON:  Yes, Your Honor, about five minutes

8    ago.

9              THE COURT:  Well, I did read it.  The cases that

10   were cited in that memo were general opening-the-door

11   kinds of things and actually didn't go to the issue of

12   whether the evidence would have been permissible in any

13   event.

14             So we were looking to see what happens when

15   evidence has been suppressed.  I couldn't find a Ninth

16   Circuit case, but we found some other cases.  And I guess

17   the one that is the most helpful to me -- and this

18   actually is cited many times by other courts -- is called

19   Illinois versus Payne, P-A-Y-N-E.  This is at 456

20   Northeast 2d 44.  So it's a Supreme Court of Illinois case

21   from 1983.  And I can tell you quite a bit about it.

22             In this case there had been a motion to suppress

23   evidence of a gun which had been seized and without a

24   warrant.  And the gun was suppressed on the ground that --

25   although the police had had probable cause to go in and

1    arrest the defendant, that, when they had thereafter
2    searched the premises, they really should only have
3    searched areas within the defendant's immediate control.
4    This gun happened to have been found in a refrigerator.

5          And so the trial court had said the interior of
6    the refrigerator was not in the defendant's immediate
7    control; so there was no need for law enforcement to have
8    gone rooting around in the refrigerator and they should
9    have gone and gotten a warrant if they had some reason to
10   think that they should go into the refrigerator.  So the
11   gun was suppressed.

12         This case involved armed robbery and burglary of
13   a private apartment, and what had happened was that during
14   trial the defense counsel asked whether the defendant had
15   been searched at the time he was arrested and the witness
16   said yes.  And then the defense counsel said was the
17   apartment searched, and the witness said yes.

18         And the government argued that there was left an
19   impression that nothing had been recovered through the
20   search because of this colloquy, and the trial judge,
21   therefore, said that the defense had opened the door and
22   that it was then permissible for the government to come
23   back to elicit evidence of the gun that had been found in
24   the refrigerator.  This was a subject up on appeal, and
25   the appellate court said that it did not think the trial

 1    judge had committed error in allowing the state to rebut
 2    the false implication that nothing had been recovered even
 3    though a search had indeed been conducted.

 4           Well, that's pretty close, I think, to what we
 5    have here, and I'm kind of inclined to say that, if the
 6    defense elicits testimony that leaves with the jury the
 7    impression that prudent law enforcement officers would
 8    have done more than these officers would have done, then
 9    these officers, it seems to me, are entitled to say:
10    Well, let me tell you all the information we had so that
11    you can put it in the context of what a prudent law
12    enforcement officer with all of this information would
13    have done, which is different from what a prudent law
14    enforcement officer -- which may be different from what a
15    prudent law enforcement officer may or may not have done
16    without some of this evidence.  I think that's fair.  And
17    I think that you would then open the door, and they should
18    be allowed to do that.  But --

19           MR. GORDON:  May I be heard?

20           THE COURT:  Yes.  Yes.  This is an inclination
21    on my part.

22           MR. GORDON:  Thank you, Your Honor.  Of course,
23    the prosecutor is asking for so much more than that.
24    You've read her brief.  She really wants to stop the
25    defense from presenting a defense.  Any witness that we

1   would call or any witness of hers that we would
2   cross-examine that we left any impression that Mr. Meston
3   was involved as a drug dealer would then open the door,
4   under her theory, for the introduction into evidence of
5   the alleged inculpatory statements -- and I use "alleged"
6   double:  "alleged" that they were made and "alleged" that
7   they're inculpatory -- so as to rehabilitate the
8   cross-examined witness or so as to impeach the witness
9   called by the defense.  That's the position they're taking
10  in this brief.

11            Under the prosecutor's view of the law almost
12  any question that I would ask any of her witnesses would
13  entitle her on redirect to rehabilitate them, and in that
14  course of rehabilitation, no matter how obtuse or no
15  matter how unrelated to the actual place that they were
16  impeached, the witness might well say:  Well, I did that
17  because Mr. Elliot confessed.

18            THE COURT:  Well, I'll say this:  At this point
19  I'm actually only looking at your cross-examination of the
20  witness who's now on the stand.

21            MR. GORDON:  Yes.

22            THE COURT:  Okay?  And, if you have a concern --
23            MR. GORDON:  Let me address that also.

24            THE COURT:  But, if you have a concern about a
25  subsequent witness, I'm happy to have another colloquy

```
 1    about what you anticipate may be an issue or what the
 2    government may anticipate will be an issue with respect to
 3    another witness.  But, you know, let me deal with the
 4    specific situation that's before me, and the one --
 5    because the jury is here and waiting.  So my preference
 6    is, if we have something that we have to deal with at 1:30
 7    today, deal with it at lunchtime so the jury isn't kept
 8    waiting.  Right now the immediate situation is we have
 9    this detective on the stand.  Let's deal with the issues
10    that will be raised by his cross-examination and put off
11    for the moment future issues because they may or may not
12    arise, but, if they are going to arise, I may well be able
13    to dispose of them without keeping the jury waiting.
14              MR. GORDON:  Those issues will arise, and we
15    will address them witness by witness apparently.  Let's
16    talk about this witness --
17              THE COURT:  Yes, please.
18              MR. GORDON:  -- who is in the midst of
19    cross-examination.  First of all --
20              THE COURT:  In fact, you know, I'm a little
21    concerned.  Although he is the case agent --
22              MR. GORDON:  Yes.
23              THE COURT:  -- and he's allowed to sit through
24    the trial, we are now talking about areas of his
25    cross-examination.  I'm a little uncomfortable -- it's not
```

1    the same as if the defendant were up on the stand.   I

2    think that I should excuse Detective Woodward from this

3    particular legal colloquy.

4            MS. SAMESHIMA:  Well, Your Honor, I think the

5    witness needs to know, though, the extent to which he can

6    go based on the court's ruling.

7            THE COURT:  I'm happy to advise him -- to have

8    him come back in and give him the legal ruling, but this

9    back and forth about the law while he's in the midst of

10   cross-examination, it seems to me, is not something that

11   he should be privy to.  If you have an argument as to why

12   he should be, that's fine, but he's -- I know he's here as

13   a representative of the government, but he himself is not

14   on trial; so it's not the same as Mr. Elliot being here.

15   So I think he ought to step outside.

16           MS. SAMESHIMA:  I don't see how discussion of

17   the law, though, that would influence or give him an

18   advantage in his testimony, I guess.

19           THE COURT:  The same as if -- let's say it's

20   another witness, okay?  Let's say it were Mr. Meston.  We

21   would not let Mr. Meston sit in the courtroom in the midst

22   of his cross-examination while we discuss this issue.  I

23   want to treat Detective Woodward in the same way for

24   purposes of this discussion.

25           MS. SAMESHIMA:  That's fine, Your Honor.

```
 1            THE COURT:  Okay.  So I'm going to ask him to
 2   step outside.
 3            (Case agent excused.)
 4            THE COURT:  Okay.  So wait till he's gone, and
 5   then I'll let you --
 6            MR. GORDON:  I'd like to reserve for the record
 7   this entire discussion that's going to need to be held
 8   with almost every witness.
 9            THE COURT:  That may be.
10            MR. GORDON:  Okay.  I'm reserving that.  I'm
11   going to talk about the witness currently under
12   cross-examination.
13            THE COURT:  Yes.
14            MR. GORDON:  The case that you cite is a
15   state --
16            THE COURT:  Do you want it?  I can have my law
17   clerk print it up?
18            MR. GORDON:  No, no.  I heard you loud and
19   clear.  It's a State of Illinois Supreme Court --
20            THE COURT:  Yes.
21            MR. GORDON:  -- not binding on this court --
22            THE COURT:  No, certainly not.
23            MR. GORDON:  -- and not on all fours with what's
24   happening here nor germane.  What is happening here is
25   that a statement was elicited in violation of Miranda
```

1    rights from the defendant.  That is a separate and

2    completely distinct category to begin with from the fruits

3    of a search.

4              THE COURT:  Okay.  First of all, I have not

5    ruled --

6              MR. GORDON:  I understand.

7              THE COURT:  -- that it is in violation of

8    Miranda rights --

9              MR. GORDON:  I'm coming to that.

10             THE COURT:  -- but I don't think I need to rule,

11   and this is why.  Although, I'm not going to cut you off,

12   but it might be helpful to you to know what's in my head.

13             It seems to me that, when we look at the law

14   that says, if a defendant testifies, then, even if a

15   statement has been suppressed, that statement can be used

16   to impeach the defendant, if he testifies.  Well, what is

17   the underlying policy --

18             MR. GORDON:  What's the rationale?  Precisely.

19   United States versus Harris.  That's just what I was going

20   to say.

21             THE COURT:  Hold on.  Hold on.  So let me finish

22   this thought.  The thought is that you should not allow

23   someone to benefit from telling a lie.

24             MR. GORDON:  Precisely.

25             THE COURT:  And it seems to me that, although

1    this is not exactly a lie, it is -- if a false impression
2    is left with the jury, then it is akin to the lie in that,
3    basically, there is profit being made out of a Miranda
4    violation.  And I don't think that that was the purpose of
5    the Miranda rule in the first place.  The Miranda rule is
6    to deter law enforcement from going ahead and getting
7    statements without the person being interrogated
8    understanding that they need not do so.

9            Now, if, in fact, the police had beaten a
10   statement out of Mr. Elliot, one, probably the statement
11   would be so unreliable that it would never be allowed to
12   be brought in under any condition.  But, two, even if it
13   were brought in under the idea of the door having been
14   opened, then certainly the defense would want to put
15   before the jury the unreliability of the content of that
16   statement because of the manner in which it was obtained.

17           With a Miranda violation you don't have that
18   issue.  The Miranda violation does not go to whether the
19   statement is reliable or not.  In other words, a defendant
20   who gives a statement unMirandized is not being presumed
21   by anyone to have lied in giving that statement.  The
22   defendant who gives an unMirandized statement is instead
23   looked at as someone who might not have given that
24   statement but for not understanding his right to be
25   silent.  But it doesn't go to the veracity of the

1    statement itself.

2              Now, when I look at that analysis, it seems to
3    me that whether this was a violation of Miranda or not is
4    not relevant to the jury because it doesn't go to the
5    veracity of the statement that the government wants to
6    offer the way it would go if we had a confession that came
7    after a brutal beating.  Okay?  So, when I look at that, I
8    think I need not decide this issue of whether this was an
9    illegally obtained statement because the illegality or
10   legality of it is irrelevant, and I would not allow you to
11   bring that issue up before the jury.  I think I probably
12   would let you ask when in the course of events this
13   happened, had he had his Miranda rights or not, but that's
14   about as far as I would let you go on that without going
15   into you should have given him Miranda rights because I
16   can't see the relevance of this.

17             MR. GORDON:  I don't want to go anywhere near
18   that.

19             THE COURT:  And with all of that it seems to me
20   that I'm not called upon to decide whether this is in
21   violation of law or not if I think the door has been
22   opened.  So that's why I'm focusing on whether the door
23   has been opened because in the one with the gun there was
24   a clear suppression order.  The gun had been suppressed.
25   Notwithstanding that suppression order, when the door was

1    opened that evidence came in.

2              So to me the only issue is:  Has the door been
3    opened, not should the statement have been suppressed.
4    Because, even if it is suppressible, if the door has been
5    opened, it seems to me it comes in.  But that's my
6    thought, not a ruling; so let me invite you now to
7    respond.

8              MR. GORDON:  Thank you, Your Honor.  With all
9    due respect to your analysis I don't believe it's correct.
10   I believe that the law is stated by the United States
11   Supreme Court in New York versus Harris, or Harris versus
12   New York, at 401 U.S. 225.  And in that opinion the
13   Supreme Court carved out a very limited exception to
14   Miranda, and the Supreme Court said, if a defendant takes
15   the stand and testifies at a variance from the statement
16   he gave to the police, he should not be able to use
17   Miranda as a shield to his perjury or to the potential
18   that he might have perjured himself.  We do not want to
19   countenance perjury; so we will allow in that instance,
20   when a defendant voluntarily takes the stand and testifies
21   contrary to the alleged statements he made that were
22   suppressed under Miranda, in that limited instance we will
23   allow the defendant to be cross-examined on those
24   statements, despite the fact they were garnered in
25   violation of his constitutional rights.

```
 1              There is no United States Supreme Court case,
 2   nor Ninth Circuit case, nor any other case that I found,
 3   that expands New York versus Harris to this situation.
 4   This situation being, Your Honor, for the record a police
 5   officer testifying about a search that he may or may not
 6   have conducted and who's now going through
 7   cross-examination and the defense wants to ask him about
 8   the search, and the prosecution has indicated that, if we
 9   do that, she would like the right to then have him explain
10   why he searched, based on statements that were made by the
11   defendant.  That shield has never been breached or broken
12   by any appellate court decision.
13              THE COURT:  Well --
14              MR. GORDON:  If it has, Your Honor, I couldn't
15   find it.  And, if I'm wrong on the law, if someone has
16   researched it and has an opposite case, then I will be
17   very happy to read it and stand corrected.  However, I
18   have read the brief --
19              THE COURT:  So I'm looking at this Second
20   Circuit case.  I mean it wasn't all that much on point,
21   but I'll talk to you about it.
22              MR. GORDON:  I'm coming to that.  Your Honor --
23              THE COURT:  Yes.
24              MR. GORDON:  -- I have read the brief that was
25   handed to me --
```

```
1              THE COURT:  No, no.

2              MR. GORDON:  -- about five minutes before the

3     hearing.  That case does not relate to this point.

4              THE COURT:  Exactly, I agree with you.

5              MR. GORDON:  Secondly, Your Honor --

6              THE COURT:  But I do have --

7              MR. GORDON:  -- the question of the search was

8     raised on the direct examination by the witness who

9     testified, "I searched 116 Kapunakea Street."  Now, he

10    can't be allowed to say that and then the defense not be

11    allowed to question him about it on the fear that a new

12    step in the law will be made and Miranda will now be

13    revoked and the defendant's Fifth Amendment and Sixth

14    Amendment rights will be temporarily suspended so as this

15    officer can be rehabilitated after cross-examination.

16             THE COURT:  Okay.  I'll tell you about this

17    case.  It's a little unusual because of the timing of it.

18    This is a Second Circuit case, United States Court of

19    Appeals for the Second Circuit.  It is called, I think,

20    Costello versus Faye at 350 F.2d 400.  And I'm going to

21    ask my law clerk to print this up so I can give you copies

22    of it.

23             It's kind of an odd case, okay?  What happened

24    here was Mr. Costello was convicted in New York State

25    court for selling heroin, and he brought a habeas corpus
```

 1    petition.  This was in 1965.  And this case happened to
 2    arise in the intersection of changes in the law because
 3    the exclusionary rule of Matt v. Ohio had issued, but at
 4    the time of Mr. Costello's trial illegally seized evidence
 5    could still be admitted in state court under the case of
 6    Wolf v. Colorado.  The prosecutor did not bring up the
 7    search, which was the subject in issue.

 8         Now, Matt v. Ohio -- it's a very odd situation
 9    in the timing of the trial, but in any event what the
10    majority held was where the issue of whether or not the
11    fruits of an illegal search can be used turns on whether
12    the prosecutor overstepped the bounds of a subsequent
13    appellate decision or whether the tactics of opposing
14    counsel gave him leave to do so, then the whole idea of
15    the exclusionary rule doesn't apply because the police are
16    not likely to be deterred in conducting an illegal search
17    by taking a gamble on how this law is going to work out.
18    That was the essence.

19         So what happened in this case was in the state
20    court trial the prosecutor asked:  Did you search the
21    apartment?

22         Answer:  Yes, we gave it a search.

23         Question:  Did you find anything?

24         Answer:  Yes.

25         Defense counsel then asked:  Were drugs found?

1        Answer was no.

2        Then the government came back on redirect and
3   brought out, over the defense objection, that a wire
4   clothes hanger and a silk stocking, instruments used to
5   cut the drugs, had been found in the search.  And this was
6   objected to, and eventually it became the subject not only
7   on appeal but also of this habeas thing.

8        Okay.  And the majority said that we don't think
9   that that was something that warrants relief.  And the
10  defense -- I'm sorry.  The concurrence -- this is Judge
11  Kauffman of the Second Circuit concurring -- characterized
12  what happened as part of a carefully planned tactical
13  maneuver to bring before the jury evidence which the
14  defense considered favorable and then to seek refuge from
15  anything which would bring before that jury the balance of
16  the circumstances.

17       Now, the very argument that you're raising was
18  discussed, but it was by the dissent.  And the dissenting
19  circuit judge was Judge Marshall, who said, "Look, it's
20  the prosecutor, not the defense counsel, who brought up
21  the whole matter of the search on the direct exam of this
22  witness.  So why are we allowing this opening-the-door
23  kind of analysis?"  But that's the dissent in this Second
24  Circuit case.

25       So I understand the argument you're making, and,

1    you know, it's not that I'm ignoring it --

2              MR. GORDON:   I don't think that --

3              THE COURT:   -- but I don't see the law there

4    that -- but I want you folks to look at this case because,

5    as I say, this case is a little difficult to parse given

6    the timing of when the trial occurred, which was right at

7    the crossroads of lots of U.S. Supreme Court cases about

8    how to treat illegal search evidence.

9              MR. GORDON:   Your Honor --

10             THE COURT:   And yet it has some things that

11   might well be useful to us as we think about this.

12             MR. GORDON:   This case, the case before us

13   today, does not really relate to the facts as you describe

14   them.   You are mixing in the attempt to rehabilitate a

15   witness on redirect by a prosecutor who's been

16   cross-examined about a search where certain things were

17   suppressed.   You -- I believe, incorrectly -- are seeing

18   that as an analogy to a Fifth and Sixth Amendment case.

19             THE COURT:   Yes.   Yes, I mean I am definitely.

20             MR. GORDON:   There is nothing in the

21   cross-examination that I propose to do that will talk

22   about any statements or elicit any perjured testimony.

23   None of the rationale of New York versus Harris will be

24   found in the cross-examination, nor of the cases you've

25   cited where the search was caused in the -- was brought

1    into question so the testifying officer on redirect talked
2    more about the search.

3              Here the prosecutor wants to use the fact that
4    the search was brought up and then cross-examined on as an
5    avenue to bring out a statement by the defendant, the
6    statement that was obtained in violation of his Fifth and
7    Sixth Amendment rights -- those are too obviously to
8    say --

9              THE COURT:  Well, except --

10             MR. GORDON:  -- and I apologize for saying it.
11   They're obviously different than the Fourth Amendment,
12   which was at issue in the cross-examination, the actual
13   search.  What did you get?  That's a Fourth Amendment
14   question.

15             THE COURT:  But the concurrence points out that,
16   look, you get to look at the balance, the balance, of
17   circumstances.  If you -- if your point on the defense
18   side is to bring in evidence favorable to your client,
19   then the government in fairness gets to show the balance
20   of the circumstances in which this piece of favorable
21   evidence by the defense rests.  That you don't get to just
22   take part and not the whole set of circumstances.  That's
23   the import of that, and that seems to me to be a fairer
24   approach.

25             MR. GORDON:  There is no import in the decisions

 1    you've mentioned that allow a otherwise inadmissible
 2    statement by the defendant.
 3              THE COURT:  As I say, I'm not making that
 4    decision, but --
 5              MR. GORDON:  Right.  Well, that's where we're
 6    heading.  We're talking about a statement by the
 7    defendant.
 8              THE COURT:  You know, what I'm doing is I'm not
 9    deciding --
10              MR. GORDON:  No court has said that.
11              THE COURT:  -- I'm not deciding that I would or
12    would not have suppressed the defendant's statement
13    pretrial had that issue been something I was required to
14    rule on.  What I am saying is, even if I assume that I
15    would have suppressed it had the matter been before me for
16    decision, I think once the door is open -- so that's why
17    we're talking about whether the door has been opened.  And
18    I understand you're saying it's not opened in the way the
19    door was opened in the cases that I've described.  But
20    once the door is opened, then I think, even if it was
21    suppressed by me, it gets to come in, unless there's
22    something about the statement that, independent of whether
23    there's a legal ruling or not, makes it -- calls its
24    veracity into doubt, in which case I may well keep it out
25    no matter what.  But absent that kind of circumstance,

1    even if I suppress it because it was a violation of
2    Miranda, I think, if the door has been opened, it comes
3    in.

4            So I think the real discussion you and I should
5    be having should put aside whether the statement is legal
6    or illegal.  Assume it is illegal, but has the door been
7    opened?  Because for me that is the critical question:
8    Has the door been opened?  Forget about whether it's legal
9    or illegal.

10           MR. GORDON:  Clearly, the defense has not
11   because we had this colloquy yesterday before the
12   cross-examination began and I studiously avoided getting
13   into it.

14           THE COURT:  Right.  Will the door be opened?
15   I'll put it this way:  Will the door be opened if you
16   ask --

17           MR. GORDON:  However, the door was opened by the
18   prosecutor, and the questions and answers adduced on
19   direct testimony where the witness said he conducted a
20   search.

21           THE COURT:  Okay.  But that's exactly why I
22   pointed that out in the dissent.  That your argument was
23   made by the dissent in this Second Circuit case, but the
24   majority did not buy that that just because the prosecutor
25   mentioned it, that, if the defense then comes in and draws

1    out inferences favorable to the defense, that the

2    prosecution cannot come back on redirect.  That's your

3    argument, and that was rejected by the majority in the

4    Second Circuit case.

5              MR. GORDON:  That is not my argument.

6              THE COURT:  Okay.

7              MR. GORDON:  My argument most precisely is that

8    the only time a statement from a defendant that was gotten

9    in violation of his Miranda rights, in violation of his

10   Fifth and Sixth Amendment rights, can be used is to

11   impeach and not allow perjury.  Nobody is suggesting as

12   yet that the officer has perjured himself.  It does not

13   relate -- the case law and the facts do not relate to

14   what's going on with this officer.

15             THE COURT:  It doesn't make any sense to me that

16   somehow a Miranda right -- that the violation of Miranda

17   puts into play a higher level of protection than a Fourth

18   Amendment violation.  That doesn't make sense to me.  But

19   I think that's what you're arguing to me:  that the cases

20   that I've cited, even assuming that you agreed with them,

21   are limited to the Fourth Amendment context, and, when

22   there has been a Fourth Amendment violation and then

23   during trial the defense opens the door, then, all right,

24   the materials seized in violation of the Fourth Amendment

25   can come in in response to opening the door.  But, when

```
 1    it's a Miranda violation and the defense opens the door,
 2    then because it's a Miranda violation, which somehow has
 3    some higher level of existence than a Fourth Amendment
 4    violation, that, even if the defense opens the door, the
 5    unMirandized statement cannot come in in rebuttal.
 6             I think that's what you're arguing to me.
 7    What's the policy basis for making that distinction?
 8             MR. GORDON:  The policy basis is the court's
 9    aversion to perjury, stated in New York versus Harris.
10    The sole exception to Miranda is to not countenance
11    perjury by the defendant, not when a policeman takes the
12    stand and testifies about a search.  You can then perhaps
13    open the door to his testimony about an illegal search by
14    cross-examining him about it.  Maybe that's what these
15    cases say, but they do not say --
16             THE COURT:  I think that's a circumstance that
17    happened to arise in Harris.
18             MR. GORDON:  Right.  But they do not say in no
19    case that I found -- and I beg the court's pardon.  I'm
20    repeating myself and I'm interrupting you --
21             THE COURT:  That's okay.
22             MR. GORDON:  -- and I'm going to sit down in one
23    second.
24             THE COURT:  No, no.  Go ahead.
25             MR. GORDON:  No case that I found, nor that
```

1    counsel found, nor the people that we called and had
2    access to their computers found stands for the proposition
3    that the Miranda -- the statements obtained from the
4    defendant in violation of his Miranda rights, in violation
5    of the Fifth and Sixth Amendment, can be used to bolster a
6    policeman's excuses for why or why not he did or did not
7    conduct a more diligent or less diligent or some kind of
8    search.  And I think that's the state of the law.

9              THE COURT:  Okay.  I think what happened was
10   Harris happened to involve the circumstance where a
11   defendant was testifying, and so Harris ruled in that set
12   of circumstances.  I don't think the U.S. Supreme Court
13   said, "And there are no other circumstances ever that
14   could ever arise that anyone could ever imagine where we
15   would ever allow an unMirandized statement to come in."
16   The Supreme Court ruled on the circumstances before it.
17   And those circumstances did happen to involve a testifying
18   defendant that raised the concern about perjury.

19             But there is nothing in Harris or any other case
20   that I saw that went so far as to say it is inconceivable
21   that there would ever be any other set of circumstances
22   where an unMirandized statement could come in.  I mean the
23   Fourth Amendment is -- the Fourth Amendment has a longer
24   history than Miranda.  I mean I realize that Miranda rests
25   on the Fifth Amendment --

```
1                 MR. GORDON:  And the Sixth Amendment, Your
2     Honor.
3                 THE COURT:  Okay.  And the Sixth Amendment.
4     But, you see, the idea of these Miranda rights, I mean
5     this was a judicial construct, and so to somehow say that
6     that gives somebody a higher plane of existence than the
7     Fourth Amendment doesn't make any sense to me.  So I think
8     the door is opened.  If the impression that you leave with
9     the jury is that this officer did not do what a reasonable
10    officer would have done, which is conduct other inquiry or
11    search regarding Mr. Meston, I think a wrong impression is
12    left if what is left is that he had only the evidence that
13    he's testified to so far.  I think he's allowed to put
14    that into context.
15                So I'm going to rule.  I'm going to rule that,
16    if you question Detective Woodward in a way that leaves
17    the impression that he somehow, based on the evidence now
18    before the jury, was less diligent than he should have --
19    than an officer should have been in his shoes by not
20    further searching Mr. Meston's house or doing further
21    inquiry about Mr. Meston, he's entitled to say what it was
22    that he had so that the officer placed in his shoes will
23    have the full panoply of the evidence that he had.
24                But let me turn then to the issue of mentioning
25    the Miranda rights, and give me a second there so that I
```